**TRANSCONTINENTAL PIPE LINE CORPORATION**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Pennsylvania**

No. CIV.A. 01–448A.

United States District Court, M.D. Louisiana.

May 20, 2005.

Godfrey Bruce Parkerson, S. Michael Cooper, Plauché, Maselli, Landry & Parkerson LLP, New Orleans, LA, for Plaintiffs.

Robert I. Siegel, Gieger, Laborde & Laperouse, LLC, New Orleans, LA, Michael B. Alker, McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Covington, LA, Nathan L. Schrantz, Simon, Peragine, Smith & Redfearn, New Orleans, LA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, District Judge.

### BACKGROUND

This matter arises from the denial of insurance benefits by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") to Transconti-

nental Pipe Line Corporation ("Transco") for claims asserted against Transco in the state court matter entitled *Geraldine Ard, et al v. Transcontinental Gas Pipe Line Corporation, et al*, Civil Action 15,089; 21st Judicial District Court, Parish of Saint Helena, State of Louisiana ("*Ard* litigation"). The court has previously held, on summary judgment, that Transco is an "insured" under the National Union policies at issue, and that National Union had a duty to defend Transco against the state court claims (Ruling dated February 5, 2002, doc. 32). Trial on this matter was held February 22–23, 2005.

## FINDINGS OF FACT

1. On September 6, 1994, Transco entered into an agreement with Counties Corporation, calling for Counties to replace sections of two Transco gas pipelines which lay beneath the Amite River in St. Helena Parish, Louisiana (the "river crossing project"). The contract included an obligation by Counties to carry a comprehensive general liability insurance policy that would cover Transco as an "additional insured."

2. Danella Companies, Inc., ("Danella") the parent company of Counties, obtained a comprehensive general liability policy (CGL Policy) from National Union for the period of October 1, 1994 to October 1, 1995 (policy no. RM 319–91–76). This policy contains an endorsement in which National Union agreed to add as an insured any organization Counties was obligated to include as an "additional insured" pursuant to a written contract.

3. National Union also issued a commercial umbrella policy to Danella (policy no. BE 309–51–94), which policy provides for an insurance limit of $10 million in excess of the underlying policy's $1 million.

4. Included in the National Union CGL Policy is the following Notice Condition:

   a. You must see to it that we are notified as soon as practicable of any "occurrence" or an offence which may result in a Claim. Knowledge of an "occurrence" by your agent, your servant, or your employee shall not in itself constitute knowledge to you unless the Director of Risk Management or his/her designee, at the address shown in the policy declarations, will have received such notice. To the extent possible notice should include:

   i. How, when and where the "occurrence", or offense took place

   ii. The names and addresses of any injured persons and witnesses; and

   iii. The nature and location of any injury or damage arising out of the "occurrence" or offense.

5. The National Union CGL Policy also includes a Cooperation Condition requiring that:

   C. You and any other involved insured must:

   1. Immediately send us copies of any demands, notices, summons or legal papers received in connection with a claim or "suit";

   2. Authorize us to obtain records and other information;

   3. Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

   4. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured

because of injury or damage to which this insurance may also apply.

6. The additional insured provision contained in the National Union CGL Policy is found in Endorsement No. 8 and amends the "Who Is An Insured" provision in the policy to add:

any person or organization to whom you become obligated to include as an additional insured under this policy, as a result of any contract or agreement you enter into which requires you to furnish insurance to the person or organization of the type provided by this policy.

Under this provision, Transco, as a result of the contract between it and Counties, is covered as an "additional insured."

7. The National Union Umbrella policy ("Umbrella policy") provides similar notice and cooperation provisions as the CGL policy, and covers those parties that are included in the primary (CGL) policy.

8. Counties completed all work on the project in January 1995 and on March 19, 1995, the natural gas pipeline subject to the contract and owned and operated by Transco ruptured, causing a fire and natural gas release.

9. On March 16, 1996, suit was filed in the 21st Judicial District Court, Parish of St. Helena, State of Louisiana, by approximately 350 individuals claiming injury or illness as a result of the incident. This suit was entitled *Geraldine Ard, et al v. Transcontinental Gas Pipe Line Corporation, et al.* Transco removed the *Ard* litigation to the United States District Court, Middle District of Louisiana on

April 10, 1996, where it remained for more than two years before being remanded to state court on September 4, 1998.

10. On April 30, 1998, during which time it was relatively certain that the *Ard* litigation was to be remanded to state court, Don Hockaday of Transco notified Counties of the *Ard* lawsuit, enclosed a copy of the complaint, advised Counties of the plaintiff's theory, and further enclosed copies of the plaintiff's expert reports and depositions.[1] That letter states, in part:

The purpose of this letter is to notify you that the plaintiffs in the Lawsuit have hired expert witnesses who have expressed the opinion that the pipeline rupture was most likely caused by a gouge put in the pipeline during the tie-in of the pipeline replacement under the Contract (the "Tie-in Claim"). Copies of their written reports and deposition testimonies in the Lawsuit are enclosed. Transco has hired its own expert witnesses, who have expressed the opinion that, although they do not dispute that the gouge was probably caused by heavy excavation equipment, it is pure speculation to conclude that the gouge was caused during the work done during the replacement of the segment of Main Line "B" beneath the Amite River. Copies of their written reports and deposition testimonies in the Lawsuit are also enclosed.

．　　　．　　　．　　　．　　　．

... Although we believe the Tie-in Claim and the Punitive Damages Claim are both "Claims" as defined in Article 4.2 of the Contract, it is not

---

1. Counties, at this time, had not disclosed to Transco the name of the insurer according to the terms of the work contract. As a result, it was not possible for Transco to contact National Union directly.

our intention to demand indemnity or insurance coverage at this time. We do, however, wish to notify you that Transco reserves the right to demand indemnity and insurance coverage for the Tie-in Claim and the Punitive Damages Claim from your company in the future. We would also recommend that your company place its insurer on notice of this potential exposure, so that it can participate as it sees fit to protect the interests of the insureds (including Transco) under the insurance coverages required by the Contract.

11. When the April 30, 1998 letter was sent, the Ard lawsuit had been pending for two years. Although the state court petition, as originally filed, was broad enough to include the work done by Counties, the plaintiffs had not focused their claims against the work performed by Counties until shortly before that letter was sent. Transco noted in its letter to Counties that the Fifth Circuit had ruled against it, and that, in all likelihood, the case would be remanded to state court—though it planned to move for a rehearing.

12. National Union received notice of the lawsuit from Counties on June 26, 1998, when Robert Weinberger, counsel for Danella Companies, Inc., sent to National Union: 1) Hockaday's April 30, 1998 letter that advised of the contract; 2) Identification of the National Union Policy; 3) the Ard Petition; and 4) expert reports that opined that the work performed by Counties was the probable cause of the explosion. Neither Counties nor National Union made any response to Transco following this communication.

13. Shortly after National Union received these documents from Counties, Robert Weinberger was hired by National Union to represent the interests of National Union and Counties in regard to this litigation, despite the knowledge of the potential conflict between Transco and Counties.[2]

14. By letter dated May 29, 1998, Mr. Weinberger acknowledged receipt of Transco's letter of April 30, 1998, requested copies of all pleadings (which were provided by Transco) and requested to be kept informed as to the status of the case.

15. As noted above, on September 4, 1998, the case was remanded to state court upon order of the Fifth Circuit. On November 6, 1998, barely two months after remand, the state court issued a scheduling order setting a bench trial for January 5, 1999. Transco did not notify Counties of the trial date; nor did Robert Weinberger contact Transco seeking any information.

16. The liability portion of the bifurcated trial took place on January 5–8, 1999 in St. Helena Parish. During the trial the parties did not dispute that a pre-existing gouge in the pipeline caused the rupture and resulting explosion. All experts at the trial opined that the gouge was the result of heavy construction equipment, such as a backhoe. The plaintiffs submitted substantial evidence at trial of the presence of backhoes in the area of the rupture as a result of Counties

---

2. Although the National Union adjuster testified that he thought Mr. Weinberger was engaged to evaluate the coverage issues, Mr. Weinberger testified that he was not so engaged and that he did not evaluate the coverage issues. He also testified that throughout this period he avoided taking any action that might encourage the filing of a third-party complaint against Counties by Transco.

work during the Amite River Crossing Project—only a few months prior to the explosion. Additional expert testimony was presented that the pipeline could not function for long with such a large gouge, and that the lack of corrosion indicated a fairly recent gouge. Thus, substantial evidence was presented during the *Ard* trial that Counties caused the gouge and resulting explosion.

17. Neither the *Ard* Plaintiffs nor Transco asserted any claim directly against Counties during the entire course of the *Ard* litigation; thus, Counties was never made a party to the lawsuit.

18. Although the state court trial on liability ended January 8, 1999, the court did not issue its ruling and reasons until September of that year. Following the trial, on January 27, 1999, Don Hockaday of Transco sent a letter to Mr. Weinberger advising that substantial evidence had been presented at the *Ard* trial implicating Counties. In that letter he demanded additional insured coverage, and requested that Counties and its insurer participate in settlement negotiations. This letter was forwarded to National Union. On February 5, 1999, Weinberger sent a copy of the Counties contract to National Union, and on February 22, 1999, asked National Union to communicate its position on coverage to Transco. National Union did not respond.

19. On September 13, 1999, Weinberger again wrote a letter to National Union's counsel asking for National Union's position on coverage. Again National Union did not respond.

20. Also on September 13, 1999, National Union received a copy of the *Ard* plaintiffs' post-trial memorandum on the issue of liability, specifically arguing Transco's vicarious liability for the offenses of Counties.

21. On September 30, 1999, the state court ruled on liability issues, as follows:

The evidence taken as a whole support a finding that it is more probable than not the ruptured portion of the gas line was gouged during the 1994–95 river crossing. Testimony and evidence support a finding that any experienced heavy equipment operator would have known if the machine he was operating had struck the line with force sufficient to leave the gouges that were present in this case. [sic] Considering the dangerous nature of the transmission of natural gas in a defective pipe, this court finds that Transco's failure to detect and repair the defect in its pipe constituted a gross deviation from the standard of care a reasonably prudent pipeline company would exercise. This deviation rises to the level of reckless disregard for the safety of the public while engaged in the transportation of a hazardous substance. Accordingly, punitive or exemplary damages are to be considered by this court in the damages portion of the trial. ("Reasons and judgment," second page).

22. Transco then sent National Union a "*Parfait* tender" (*see Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir.1973)), demanding that National Union approve a settlement amount or take over the defense of the case. Transco again sent *Parfait* tenders on October 26, 1999 and November 5, 1999, which were all rejected.

23. By letter dated November 15, 1999, National Union denied additional insured status to Transco, alleging that

it did not receive notice until January 27, 1999, and that there were no pleadings alleging that Counties caused the pipeline gouge. This was the first direct communication that National Union had with Transco.

24. Coverage having been denied, Transco settled the *Ard* litigation in December of 1999 for $1.5 million, plus $74,492.61 in costs. Transco spent a total of $952,902.44 defending the case; $49,608.32 of which were incurred after January 27, 1999—the date National Union claims it received notice.

### ISSUES BEFORE THE COURT

Having made the above factual findings, the court must determine the appropriate legal standards applicable to Transco's claim for indemnification from National Union stemming from the *Ard* litigation. Having previously decided that Transco was an "insured" under the terms of National Union's policy with Counties, the court must now decide what compensation

is due Transco for both the cost of defending the *Ard* litigation and for the settlement negotiated between Transco and the *Ard* plaintiffs. Crucial issues of law that must be decided in making this determination are: 1) the extent of Transco's duty to notify National Union, and whether this duty was sufficiently performed, and 2) the burden of proof that Transco must meet in order to recover from National Union; whether it be proof of Counties "actual liability" or merely of Counties "potential liability." In order to resolve the notice issue the court must determine at what point National Union was legally "notified" of the *Ard* litigation; whether timely notice to National Union was phrased as a "condition precedent to coverage" in the insurance contract; and what effect, if any, late notice has upon the amount of defense costs recoverable. Finally, the court must decide how the various insurance policies interact with each other, and if there are any bad faith damages recoverable by Transco under either La. R.S. 22:658(B)(1) or La R.S. 22:1220.[3]

3. LA. R.S. 22:658 states:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.

La. R.S. 22:1220 states:
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

738

## CONCLUSIONS OF LAW

1. In this diversity of citizenship action, Louisiana law applies to the plaintiff's claims against its insurer.

■ 2. Under Louisiana law, the ordinary meaning of the text in an insurance policy governs in the absence of an absurd result, and each provision is read in light of the others. In the case of ambiguity, Louisiana courts construe insurance contracts against the insurer in favor of coverage. *Williamson v. J.C. Penney Life Ins. Co.*, 226 F.3d 408 (5th Cir.2000).

■ 3. At the time of the accident, Transco was an insured under the National Union primary policy (CGL policy), and therefore entitled to a defense. (Ruling dated February 5, 2002, doc. 32). Under this policy, an insured includes "any person or organization to whom you become obligated to include as an additional insured." This language has been held to include such party as an "automatic insured," despite the fact that the policy itself does not name that party. *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104 (5th Cir.1991). It is undisputed that the plaintiffs in the *Ard* litigation alleged that Transco was vicariously liable for the acts of Counties, which acts included the gouging of the Pipeline. Therefore, as this court held in its February 5, 2002 ruling, "it is clear that Transco is an insured under the National Union policy and that the *Ard* claims, if true, fall within the coverage of the policy."

4. At the time of the accident, Transco was also an insured under the National Union Umbrella policy. The excess policy identifies as an "Insured" any organization "included as an additional insured in the policies listed in the Schedule of Underlying Insurance

...." Given that Transco is an insured under the CGL policy, it is also an insured on the Umbrella policy.

■ 5. The National Union insurance policies require that prompt notice be given of any potential claim. However, under Louisiana law, "where the requirement of timely notice is not an express condition precedent [to insurance coverage], the insurer must demonstrate that it was sufficiently prejudiced by the insured's late notice" in order to deny coverage. *Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1173 (5th Cir.1992).

■ 6. A notice provision that is phrased as a "condition precedent to coverage" in an insurance policy is one in which the policy expressly conditions coverage on timely notice to the insurer. Louisiana law requires that this language be explicitly included in the insurance contract, and cannot be inferred. *American Safety Risk Services, Inc. v. Legion Indemnity Company*, 153 F.Supp.2d 869, 876 (E.D.La.2001).

7. Neither the CGL nor the umbrella policy include timely notice as a "condition precedent to coverage"; i.e. neither policy expressly states that coverage will not be afforded if prompt notice is not provided. *Peavey Co. v. M/V ANPA*, 971 F.2d 1168 (5th Cir. 1992). (see *American Safety Risk Services, Inc. v. Legion Indemnity Company*, 153 F.Supp.2d 869, 876 (E.D.La.2001); where the court held that similar language was not an "express condition precedent" to coverage.)

■■ 8. Though untimely notice does not invalidate National Union's duty to insure Transco as an "additional insured," an insurer's duty to provide a defense does not arise until the in-

surer receives notice of the litigation, regardless of whether. the insurance company is prejudiced by the late notice. *Gully & Associates, Inc. v. Wausau Ins. Companies*, 536 So.2d 816, (La.App. 1st Cir.1988).

9.  Once notice was given to the insurance company, National Union owed Transco, as an "additional insured" under its policies, the duty to defend. From June 24, 1998 until September 4, 1998—when the case was remanded and set for trial in St. Helena Parish—National Union failed to make any contact with its insured, or apprise itself of the status of the litigation in any active way. This clearly constitutes a breach of National Union's duty to defend. In fact, National Union did not make direct contact with Transco until its declination of coverage letter on November 15, 1999; over 10 months after the trial had taken place.

10.  After National Union was notified of its potential liability under the insurance policy, it was National Union's obligation to stay apprised of the situation, since it had a duty to defend. This unilateral obligation was magnified by the fact that Transco did not know with whom Counties had procured an insurance policy. As a result, it was not possible for Transco to contact National Union directly.

11.  An insurer who breaches its duty to defend must reimburse the insured for any reasonable settlement with the plaintiff. Denial of benefits by an insurer forfeits that insurer's right to rely upon a policy clause prohibiting the insured from voluntarily settling or paying demands prior to final judgment obtained against it. *Thomas W. Hooley & Sons v. Zurich General Acc. & Liability Ins. Co.*, 235 La. 289, 103 So.2d 449 (1958).

12.  Because of Transco's lack of knowledge regarding Counties' insurer, Transco's letter to Counties dated April 30, 1998 constitutes notice to National Union. In any event, National Union was fully informed by Counties on June 26, 1998 of the pending litigation and of the involvement of Counties.

13.  Having determined National Union's duty to defend, the court now examines National Union's liability for the acts of Counties. Generally, an indemnitee must establish actual liability in order to recover payment from an indemnitor. *James v. Hyatt Corp. of Delaware*, 981 F.2d 810 (5th Cir.1993). However, "[a] practical device by which an indemnitee can protect himself against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement." *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir.1973). If this is done, a plaintiff must only prove potential liability.

14.  The case *sub judice* presents the court with an actual-versus-potential liability problem. Here Transco (the original defendant) has settled with the *Ard* plaintiffs, without the participation of the indemnitor (National Union). Finding that National Union (the indemnitor) purposefully declined to take over the case or approve the settlement when the case was tendered to it on January 27, 1999, Tran-

sco is only required to "show potential liability to the original plaintiff (*Ard* Plaintiffs) in order to support its claim against [National Union]." *Id.* at 305.

15. Potential liability has been shown in this case by the substantial circumstantial evidence put on by the *Ard* plaintiffs, resulting in the state court's interlocutory judgment holding Transco strictly liable for the acts of Counties.

16. The primary (CGL) policy in dispute is subject to a deductible of $250,000. The court finds from the clear language of the policy and the testimony of defense witnesses at trial, that this sum should not be deducted from the amount to be recovered by Transco. Rather, the language of the policy refers to the "named insured"—in this case Counties—as being responsible for the deductible.

17. Notice sufficient to inform National Union of the *Ard* proceedings and its potential liability as a result of this lawsuit was given on June 26, 1998, as a result of Transco's letter to Counties on April 30, 1998. Having determined that National Union's duty to defend did not arise until Transco attempted to put Counties' insurer on notice, National Union will only be assessed only the cost of litigation incurred by Transco subsequent to April 30, 1998, an amount stipulated by the parties to be $336,594.17.

18. At the time that National Union was put on notice, the suit was in Federal court and there had been no serious settlement negotiations between the parties. Additionally, National Union has presented no compelling evidence that the attorneys representing Transcontinental failed to properly prosecute the case at this point. As such, there has been no actual prejudice shown by National Union, and is therefore liable under the terms of the insurance contract.

19. The defendant alleges that its liability under the CGL policy should be shared with Transco's primary insurer, Aegis. However, whereas the language of the National Union policy permits "contribution by equal shares," the Aegis policy provides that if there is another policy, that its policy should be considered to be in excess of the other policy.

20. The National Union CGL policy carries the primary obligation to indemnify Transcontinental for any damage resulting from the work done by Counties. This policy provides coverage for all of the post-notice defense costs incurred by Transcontinental (those costs incurred after April 30, 1998), and for the first $1 million of the settlement with the *Ard* plaintiffs. Additionally, the parties stipulate that National Union is only liable for $127,537.35 (22%) of the $574,492.61 of the settlement in excess of $1 million under its excess (umbrella) policy. Thus, the total cost allocated to National Union for the cost of Transco's settlement with the *Ard* plaintiffs is $1,127,537.35.

21. The court does not find that the denial of coverage by National Union was "arbitrary, capricious, or without probable cause" so as to trigger the bad faith penalties under either La. R.S. 22:658(B)(1) (for failure to make an insurance payment after having been presented with satisfactory proof of loss) or La R.S. 22:1220 (for breaching its affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or claimant).

Rather, the court finds that under the unusual facts of this case, National Union has not acted in bad faith and was not arbitrary in its handling of Transco's claim. Thus, no penalty damages are due under La. R.S. 22:658(B)(1) or La. R.S. 22:1220.

## CONCLUSION

Accordingly, for the foregoing reasons, judgment will be rendered in favor of the plaintiff, Transcontinental Pipe Line Corporation, and against the defendants National Union Fire Insurance Company of Pittsburgh, Pennsylvania in the amounts of $336,594.17 for post-notice defense costs owed by National Union and $1,127,537.35 for the amount of indemnity owed by National Union for Transcontinental's settlement costs—for a total of $1,464,131.52.